IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MOLLIE C. JONES,                    )
                                    )     No. 04-6195-HU
                Plaintiff,          )
                                    )
        v.                          )
                                    )   FINDINGS AND RECOMMENDATION
JOANNE BARNHART, Commissioner )
of Social Security,                 )
                                    )
                Defendant.          )
_____)

Alan Stuart Graf
Kimberly K. Tucker
1020 S.W. Taylor Street, Suite 230
Portland, Oregon 97205
        Attorneys for plaintiff

Karin Immergut
United States Attorney
District of Oregon
Craig J. Casey
Assistant United States Attorney
888 S.W. Fifth Avenue, Suite 1000
Portland, Oregon 97204-2024

Richard M. Rodriguez
Special Assistant United States Attorney
701 Fifth Avenue, Suite 2900 MS/901
Seattle, Washington 98104
        Attorneys for defendant

FINDINGS AND RECOMMENDATION Page 1

HUBEL, Magistrate Judge:

Mollie Jones brought this action pursuant to Section 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration (Commissioner) denying her application for disability benefits and Supplemental Security Income (SSI) benefits.

## Procedural Background

Ms. Jones filed an application for disability and SSI benefits on July 1, 2001, alleging disability as of February 15, 2000. Her date last insured is December 31, 2004. The application was denied initially and on reconsideration. A hearing was held before Administrative Law Judge (ALJ) James M. Caulfield on September 17 and October 22, 2003. On February 27, 2004, the ALJ issued a decision finding Ms. Jones not disabled. On April 22, 2004, the Appeals Council declined Ms. Jones's request for review, making the ALJ's decision the final decision of the Commissioner.

## Factual Background

Born August 21, 1956, Ms. Jones was 47 years old at the time of the ALJ's decision. She completed high school and has two years of college. Her past relevant work is as a survey worker, commercial cleaner, office manager, and sales clerk.

## Medical Evidence

On March 10, 1997, Ms. Jones was admitted to Harrison Memorial Hospital in Bremerton, Washington, for suicidal depression. Tr. 207-08. She was diagnosed with bipolar disorder, mixed state. Tr.

209. She was discharged from the hospital on March 18, 1997, after being prescribed Xanax and Depakote. Tr. 206.

Ms. Jones began treatment in 1999 with Lane County Mental Health (LCMH) after moving to Oregon from Port Townsend, Washington. Tr. 419. Ms. Jones told the LCMH screener, Jeanine Bennett, Ph.D., that she had been in treatment with Rick Strassman, M.D., for two years with Bipolar Disorder 1, Rapid Cycling. Id. Ms. Jones told Dr. Bennett she was currently at a good baseline with Lithium. Id. She was no longer using Depakote because it did not work and the side effects were "awful." Id.

Ms. Jones's initial assessment for LCMH was done on March 24, 1999, by Mari Jones, M.S. Tr. 418. Her current medication regimen was Paxil, Lithium and lorazepam for anxiety, which she took only a few times a month. Id. Ms. Jones reported feeling "pretty stable right now," after having gone through many medication changes over the past several years. Id.

Asked about her current symptoms, Ms. Jones said that until the move her mood had been stable, but for the past six weeks her symptoms had become "really extreme," including panic attacks and compulsive eating, along with depression. Id. She reported that her concentration "goes up and down," but that this was a normal pattern for her. Her moods continued to change rapidly, but she said this, too, had improved. Id.

Ms. Jones's affect and mood were observed to be within the normal range. Id. Her thinking was clear and organized. She was not distracted and her rate and rhythm of speech were normal. She had

FINDINGS AND RECOMMENDATION Page 3

insight into her mental illness and showed good judgment. She was oriented x 3. She denied suicidal or homicidal ideation. Id. The examiner's diagnostic impressions were Bipolar I Disorder, most recent episode depressed, and Panic Disorder. Id.

Beginning April 8, 1999, Ms. Jones was seen approximately every two weeks by Cindy Kaufman, a nurse practitioner at LCMH, for medication management, and by Lisa Smith, LCSW and Mari Jones for counseling. Ms. Jones related that she was diagnosed with rapid cycling Bipolar I disorder in 1996, although she had excessive mood swings and "fairly classic" manic symptoms from early adolescence, including "huge expenditures, increased libido involving potentially dangerous situations, decreased need for sleep, inability to work more than six months at a time." Tr. 282. Ms. Jones reported that her high energy episodes, though coming less frequently, "last longer and are more irritable and hostile." Id. Likewise, her depressions had deepened with suicidal ideation occurring for the first time in 1996. Id. Her depressions were characterized by hypersomnia, low energy, decreased concentration, increased sensitivity, anhedonia, self criticism, and feelings of hopelessness. Id. Ms. Kaufman recorded that Ms. Jones was put on Depakote originally as a mood stabilizer, but changed to Lithium due to cognitive side effects. Id.

Ms. Jones reported panic attacks, both spontaneous and cued to social or specific phobias: elevators, tunnels, malls, grocery stores, places with crowds. Id. She admitted shoving or kicking anyone who got too close to her. Id. She was currently experiencing

FINDINGS AND RECOMMENDATION Page 4

more depressive symptoms, including hypersomnia, lack of energy, anhedonia, loss of concentration and memory loss. Id.

_____Ms. Kaufman's treatment notes between April 8, 1999 and July 8, 2002, reflect that Ms. Jones cycled frequently between depression and more elevated moods. So, for example, on April 15, 1999, Ms. Jones was "in a more elevated mood," tr. 381, but on May 6, 1999, Ms. Kaufman wrote that Ms. Jones had "no energy and motivation to do anything. Feels depressed but bothered most by the lack of energy." Tr. 380. On May 6, 1999, Ms. Jones reported a previous toxic reaction to Lithium at high doses, and said Depakote gave her memory problems of such magnitude that she could not recognize family members or find her way home from a block away. Id. She reported having very little short or long term memory, and said her son was helping her with medication changes. Id.

On May 19, 1999, Ms. Kaufman wrote that Effexor had not made an appreciable difference in her depressive or mixed states. Tr. 379. Ms. Jones reported that two days earlier, she had felt herself on the one hand depressed and at the same time irritable and energetic. Id. On June 2, 1999, Ms. Kaufman wrote, "At this point she can barely carry on her life with the cognitive difficulties caused her by the mood stabilizers ... Her mood swings are rapid and the depths of depression often paralyzing. Her children take a lot of responsibility helping her to remember to take her pills..." Tr. 378.

On June 15, 1999, Ms. Jones reported that she was in a manic phase, being up until 3 a.m. working in the house, sleeping three

hours. Tr. 376. Ms. Kaufman reviewed the records from her hospitalization in March 1997 for suicidal depression. Id.

On July 12, 1999, Ms. Jones reported having a very difficult time focusing in order to complete seatcovering work, saying she was "now backed up a couple of orders." Tr. 375. Effexor was helpful in that she no longer wanted to sleep all day, but her moods still ran from depressed to unable to concentrate and wanting to buy everything. Id. Ms. Jones reported that "daily swings multiple times from low to high." Id. The Lithium was at the highest level she could tolerate, but was "in no way at a therapeutic level," and because she associated Depakote with "much worsening of her cognitive abilities," Ms. Jones did not want to go back on it. Id. She agreed to a trial of Neurontin. Id.

On August 5, 1999, and September 1, 1999, Ms. Jones reported that she was improved on the Neurontin and Effexor. Tr. 373-74. She was beginning a job at Sears as a restocker. Tr. 373. On October 4, 1999, Ms. Kaufman wrote that Ms. Jones reported her memory problems were "steadily getting worse." Tr. 372.

On November 4, 1999, Ms. Jones reported that memory was still her most problematic symptom. Tr. 371. She had forgotten to pick up her Lithium for two or three days and became unable to function, sleeping constantly, "unable to focus or think straight." Id. Ms. Jones reported that the Effexor made her feel too irritable, so she had discontinued it. Id.

On December 3, 1999, Ms. Jones reported that she had been in a manic stage for the previous two weeks, and had almost lost her

FINDINGS AND RECOMMENDATION Page 6

job at Sears because of her irritability. Tr. 370. She reported feeling tired from "constantly being guard against doing 'something bad.'" Ms. Jones felt she was fast cycling, and "this wears her out." Id. She said she was still having cognitive problems, such as picking up a fork, but not a knife, to cut her meat and then looking at the fork for several minutes trying to figure out what to do. Id.

_____On December 17, 1999, Ms. Jones consulted Richard Kincade, M.D., reporting a longstanding problem with memory, which she attributed to her bipolar illness and to the medications she had taken. Tr. 300. She also had a number of physical complaints, including stomach difficulties, back and hip pain radiating into her legs, fatigue, and stomach difficulties. Id. Dr. Kincade thought the back pain was secondary to probable degenerative disc disease. Id. Dr. Kincade referred her to Joan Jensen, M.D., a neurologist. Tr. 301.

An annual comprehensive assessment done by LCMH on February 2, 2000, stated that Ms. Jones had not "stabilized on medication yet. Still having manic and depressive episodes and meds are being adjusted. There have been no hospitalizations this last year. Has difficulty with memory." Tr. 415. Her diagnoses were Bipolar Disorder 1 (rapid cycling), most recent episode depressed, and Panic Disorder without agoraphobia. Id. The goal continued to be continuing treatment until she was stabilized on her medications. Id.

_____On February 9, 2000, Ms. Jones consulted Dr. Jensen for

confusion and loss of memory. Tr. 294, 296. Dr. Jensen ordered an EEG with prior sleep deprivation and an MRI of the brain. Id. Ms. Jones was given these tests on February 10, 2000, with normal results. Tr 237, 238, 292, 293.

_____On February 15, 2000, Ms. Kaufman wrote that Ms. Jones was in a "depressive swing," but that she "thrives on" church work and keeps symptoms at bay during these times. Tr. 368. In March 2000, she was less depressed than on her previous visit. Tr. 367. On April 18, 2000, she reported being in a manic phase, but "controlled." Tr. 365.

On March 10, 2000, Dr. Jensen noted that because Ms. Jones's MRI and EEG had both been normal, she thought Ms. Jones's memory problems were psychiatric or due to her medications. Tr. 292.

On August 18, 2000, Ms. Jones saw nurse practitioner Carol John, reporting that she felt she was "going out of control," being very angry and irritable and then going into depression with suicidal feelings. Tr. 276. Ms. John observed that she spoke rapidly, with a "constant smile even when talking about her sense of acute distress and her angry outbursts." Id.

On August 28, 2000, Ms. Kaufman wrote that Ms. Jones had missed her last appointment after having gallbladder surgery and discontinued the Lithium. Ms. Kaufman wrote, "She was rapid cycling and irritated to the point where she found herself feeling like killing herself or someone else." Tr. 364. Ms. Jones said she "had some fear about returning to her meds after problems post surgically," but agreed to go back on the Neurontin and Clonazepam.

Id.

On September 25, 2000, Ms. Jones reported that she had quit her job at Sears and tried telemarketing, but quit that also. Tr. 363. Ms. Kaufman wrote, "Cycles of her illness interfering with work. Says each day she comes to a point of feeling like she would like to go to sleep and not wake up." Id.

On October 9, 2000, Ms. Kaufman recorded that Ms. Jones said she was doing better, but that the last mania she went through was "awful and was afraid that she would do something really bad." Tr. 362. She had charged $500 on her credit card and "bought something against the equity in her car." Id. She had also become confused about her Lithium dose and had taken too much. Id.

On November 7, 2000, Ms. Jones reported that things were better, without depressive symptoms. Tr. 361. She described "some symptoms of mania in that she doesn't worry about spending money," but she was not "going out unnecessarily to do so." Id. Her Lithium dosage was increased. Id. On December 21, 2000, she reported feeling better. Tr. 360. It was decided to try her on Tegretol, in the hope that her cognitive symptoms would improve. Id. On December 23, 2000, she reported feeling anxious, sedated, nauseated and tremorous, even after a decrease in her Lithium dosage. Tr. 359. It was decided to decrease and discontinue the Lithium. Id. Ms. Kaufman observed that her affect was depressed and her mood "down, discouraged." Id. The Lithium was discontinued and the Effexor dosage was increased. Id.

On January 24, 2001, it was noted that the Tegretol was within

FINDINGS AND RECOMMENDATION Page 9

the therapeutic range without causing cognitive side effects, and Ms. Jones agreed to another level. Tr. 358. Ms. Kaufman noted that speech was tangential and hyperverbal, "which are the only two symptoms she has of mania which she says she is moving into now." Id.

An annual comprehensive assessment done by LCMH on January 31, 2001, noted that Ms. Jones "continued to experience mood instability and other symptoms of bipolar disorder (irritability, etc.)" Tr. 413. Ms. Jones had not required hospitalization, but continued to experience episodes of both depression and mania, and to experience side effects from most mood stabilizers, "contributing to her difficulty in managing her illness." Id. Ms. Jones also reported difficulty with memory and other cognitive functioning. Id. The clinician, Lisa Smith, LCSW, noted that she had completed testing earlier in the month that revealed severe deficits in memory, object naming and other areas, "suggesting either severe depression-related deficits or early-onset dementia." Id. However, she did have a normal MRI and EEG. Id.

Ms. Jones's grooming and hygiene were excellent and she was observed to be a "warm, engaging person." Id. She reported periods of depression and mania, although she always appeared to have euthymic mood to the clinician. Id. Her affect was full-range and appropriate; speech was fast-paced but not pressured. Thoughts were logical and coherent. She reported occasional passive suicidal ideation with no plan or intent. Id.

Ms. Jones reported that she had worked briefly at Sears and as

a telemarketer. Id. She was also active as a minister in the Kingdom Hall fellowship of the Jehovah's Witnesses, which she found extremely rewarding. Id. Ms. Jones reported that she often had to cut back or eliminate her ministry schedule due to depressive or manic symptoms. Id. She also reported difficulty in household functioning, secondary to cognitive family problems, but said she was getting family support. Id.

On February 22, 2001, Ms. Kaufman wrote that other than sedation, Ms. Jones denied any side effects from Tegretol. Tr. 357. Ms. Jones said she was feeling better, "in the middle with no ups and downs. First time in a while." Id. However, Ms. Jones said she had been having what she described as mini panic attacks. Id. She was reminded to keep Ativan with her and to take Zyprexa if she had difficulty sleeping or felt any other preliminary signs of mania. Id. Ms. Kaufman noted that her affect was depressed, although Ms. Jones denied depressive symptoms. Id.

A chart note dated March 25, 2001, states that Ms. Jones was given some behavioral strategies to improve her cognitive functioning, with emphasis on the "importance of low stress/low stimulus as key to maximizing her functioning." Tr. 402.

On April 9, 2001, Ms. Jones reported that she was "feeling steady and without the major memory problems that she got from other drugs in the past," although she still forgot why she came in a room or where she put her keys. Tr. 355. On May 29, 2001, Ms. Jones reported that her moods were up and down, with a manic phase during which she spent $400 on groceries and had delusions. Tr.

354. On July 30, 2001, Ms. Jones reported doing better on the Tegretol than she had ever done. Tr. 353. She denied overspending or other signs of mania or depression. Id. She had decided to go to Nicaragua with her church, to alleviate some marital problems. Id.

On November 5, 2001, Ms. Jones was seen by Ms. Kaufman after being in Nicaragua for two months. Tr. 352. She reported several episodes of illness, including a severe allergic reaction to a skin cream and subsequent staph infection. Id. She also described "what appears to be some discreet [sic] times of dissociation." Id. Ms. Jones said things had been good for her there, and that she would like to live there. Id. She and her husband were in marriage counseling. Id.

Ms. Jones's son, John Mark Jones, completed a questionnaire on November 6, 2001, in which he stated that due to Ms. Jones's illness, he and his brother had to "take over most of the household responsibilities (i.e., cooking, cleaning, laundry) and also many financial matters (i.e., budgeting, bill paying)." Tr. 130. He also reported that "everything seems to bother her, from snoring to rock music," that she "cannot wake up, can be surly, mean rude, cannot stay focused, gets confused, forgets things, can't be counted on, can't be responsible, can't stick to pre-set schedule, and gets so caught up in details that the entire task seems daunting, overwhelming." Tr. 129. He stated on the questionnaire that Ms. Jones was unable to handle her money responsibly, did not pay her own bills, could not handle a checkbook or savings account, tr. 128, had trouble finishing chores, tr. 127, got lost or scared when

FINDINGS AND RECOMMENDATION Page 12

walking alone, and "doesn't do well in crowds," tr. 121.

On November 20, 2001, Ms. Jones related to Ms. Kaufman that her re-entry to the United States from Nicaragua had been hard, with increased depression and increased desire to sleep since her return. Tr. 400. She related more incidents of "spacing out," and described increasing memory loss, such as getting lost even when in familiar places and being unable to "make even the smallest decisions." Id.

On December 4, 2001, Ms. Jones was given a psychiatric evaluation by Lisa Sjodin, M.D., consisting of a clinical interview and mental status examination. Tr. 247-52. Ms. Jones reported manic episodes, manifested by inability to sleep and severe irritability, and depression, saying that although episodes typically last up to several weeks, sometimes she can be both manic and depressed in a single day. Tr. 247-48. She was currently in a depressive episode that had lasted several weeks. Tr. 248. She denied medication noncompliance. Id.

Ms. Jones related that she had last worked at Sears on a seasonal basis for three months, but "I didn't behave well." Tr. 249. She had a manic episode manifested by irritability and grandiosity, and described herself as "exceedingly rude" to her supervisors. Id. Ms. Jones said she fears losing control over her behavior more as she gets older. Id. Her longest period of employment was five years previously, when she worked for her husband in an office position. Id.

Dr. Sjodin observed Ms. Jones to be well-groomed and

FINDINGS AND RECOMMENDATION Page 13

cooperative, with good eye contact. Her speech was diminished in volume with many latencies, and she exhibited poverty of speech. Id. Thought processes were linear and goal directed. Id.

Ms. Jones said she had an erratic sleep pattern, getting up between 6 a.m. and 1 p.m. and going to bed between 5 p.m. and 3 a.m. Tr. 250. She reported that she often becomes distracted, forgetting what she was trying to do. Tr. 251. She is a Jehovah's Witness and she participates in group Bible studies three times a week. All her friends are through the church. She sometimes go out on preaching work. Tr. 251. She demonstrated adequate concentration, although there was mild impairment; her persistence on lines of questioning was limited by poverty of speech and some vagueness in her responses. Id.

Dr. Sjodin diagnosed bipolar affective disorder type I, most recent episode depressed. Tr. 251. She noted that Ms. Jones appeared to be currently in a depressive episode, showing impairment in her ability to concentrate and a number of speech latencies, consistent with depression. Id. She did show some mixed symptomology in that her affect was a bit labile and she laughed frequently throughout the evaluation in an "impulsive abrupt way." Id. Dr. Sjodin thought she was not likely to improve significantly within the next 12 months, as she had been compliant with her current medication and was thought to be in her baseline state. Id.

On December 6, 2001, Ms. Jones reported feeling very depressed and distressed, unable to get out of bed and feeling as if her "disease is getting worse." Tr. 351. She described what Ms. Kaufman

thought was "possible dissociative behavior," in which she would be carrying on a conversation and "all of a sudden she blurts something out as if it is coming from a completely different conversation and is totally inappropriate to the present one." Id. She agreed to try Risperdol for these episodes. Id.

On December 19, 2001, Ms. Jones reported that she had tried the Risperdal for the dissociation, but found that her dreams became so vivid that they scared her. Tr. 350. Ms. Jones and Ms. Kaufman worked on some techniques for possibly decreasing the dissociative processes. Id. Although she was taking her other medications without undue side effects, memory remained a problem. Id.

On December 20, 2001, Mari Jones and Cindy Kaufman wrote a letter on Ms. Jones's behalf, stating that she continued to "exhibit episodic unstable mood patterns which greatly compromise her ability to function." Tr. 253. They further stated that she had periods of being quite depressed, with episodes of dissociation, and episodes of hypomania. Id. "All of these states directly impact and greatly impair her ability to concentrate and focus her thinking for extended periods of time. She does not do well under stress, and decompensates mentally when in sustained stressful situations." Id. They did not believe that Ms. Jones could maintain gainful employment over the next 12 months. Id.

On January 7, 2002, Social Security reviewing psychologist Frank Lahman agreed with the diagnosis of bipolar syndrome, tr. 257, finding that she was moderately limited in her ability to

maintain social functioning and moderately limited in he ability to maintain concentration, persistence, or pace. Tr. 264. However, on a different form completed the same date, Dr. Lahman found Ms. Jones not limited in the ability to maintain attention and concentration for extended periods; not limited in the ability to perform activities within a schedule, maintain regular attendance, and be punctual; not limited in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms; but markedly limited in the ability to interact appropriately with the general public. Tr. 269-70.

On February 11, 2002, Ms. Jones reported that she was becoming unable to spell long-known words. Tr. 349. Ms. Kaufman noted that Ms. Jones had missed her three previous appointments because she forgot them. Id. Her son came to the appointment with her because her children and her husband felt she had been "losing it lately in that she is stressed and irritated about everything." Id. Ms. Jones said that from her point of view, it felt as if she had lost control, and "when she is not lashing out at the boys, she is sleeping, which is another mechanism she uses to deal with stress." Id.

On February 12, 2002, Ms. Jones was given an endocrinology evaluation by Ronald Cirullo, M.D. Tr. 273. Her thyroid function tests were inconclusive. Tr. 274.

On March 22, 2002, Social Security reviewing psychologist Dorothy Anderson, Ph.D. opined that Ms. Jensen had no mental limitations except moderate limitations on the ability to 1)

FINDINGS AND RECOMMENDATION Page 16

understand and remember detailed instructions, 2) carry out detailed instructions, 3) sustain an ordinary routine without special supervision, 4) interact appropriately with the general public, and 5) respond appropriately to changes in the work setting. Tr. 324-25.

On May 16, 2002, Ms. Jones was given a neuropsychological evaluation by Robert Kurlychek, Ph.D., to evaluate the presence of a possible early dementia after Ms. Jones described a history of cognitive decline and apparent dissociative episodes. Tr. 329-338.

Dr. Kurlychek observed that Ms. Jones was friendly and cooperative and appeared to put forth her best efforts, although she "often did appear to be overwhelmed by the tasks and looked perplexed." Tr. 331. Ms. Jones was given a number of diagnostic tests. Tr. 329. Dr. Kurlychek's diagnostic impressions were Cognitive Disorder, Not Otherwise Specified (NOS), Major Depressive Disorder, and borderline personality features. Tr. 333. He concluded:

> While this individual had difficulty on certain measures of neuropsychological functioning, it is not clear that there has been a decline from the assessment from last year. There also appear to be indicators of disruption from psychological and emotional factors. It is clear that she has a major affective disorder and this serves to interfere with her performance. It is highly likely that her cognitive difficulties are secondary to her psychiatric condition. This individual has a negative self-concept and was easily overwhelmed by challenging tasks. Recent situational stressors, e.g., recent separation from husband, certainly present her with significant distractions. ... It is highly unlikely that she has a progressive dementia such as Alzheimer's and informing her of this likelihood can be encouraging to her.

Tr. 333.

On July 8, 2002, Ms. Jones reported forgetting to get dressed, brush her hair, or eat, and getting lost. Tr. 345. Ms. Kaufman wrote that she would try to get Ms. Jones help in setting up daily systems for herself in a way that could stimulate her memory. Id.

On August 1, 2002, Dr. Kurlychek completed a Rating of Mental Impairment Severity form provided by Senior and Disabled Services for Lane County. Tr. 437-38. Based on the neuropsychological test results and his observations, Dr. Kurlychek found that Ms. Jones had moderate limitations of concentration, persistence or pace. Tr. 437. Dr. Kurlychek further found that Ms. Jones had been suffering from a chronic mental illness for at least two years, and that she demonstrated a residual disease process that "has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause [her] to decompensate, demonstrated by increased difficulty with activities of daily living, social functioning, and/or concentration, persistence, or pace. Id.

On August 12, 2002, Jocelyn Bonner, M.D. completed a Rating of Mental Impairment Severity. It appears that Dr. Bonner was the supervising physician for Nurse Practitioner Kaufman. Tr. 393, 442. Dr. Bonner opined that Ms. Jones had marked limitations of concentration, persistence and pace, and marked limitations in her activities of daily living. Tr. 441. Dr. Bonner agreed with Dr. Kurlychek's findings that Ms. Jones had been suffering from a chronic mental illness for at least two years, and that she demonstrated a residual disease process that "has resulted in such

FINDINGS AND RECOMMENDATION Page 18

marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause [her] to decompensate, demonstrated by increased difficulty with activities of daily living, social functioning, and/or concentration, persistence, or pace." Id.

On October 17, 2002, Ms. Jones reported being "somewhat spaced out," and "more depressed, yet having difficulty sleeping and getting to sleep." Tr. 465. Ms. Kaufman observed that her affect was "sad, constricted," and that she had "difficulty presenting thoughts coherently" and tears. Id. She was given Benadryl to help her sleep and her Effexor dosage was increased. Id.

On October 31, 2002, Ms. Jones said she wanted to try a vitamin and mineral supplement program that she had heard about, which required her to go off all her medications. Tr. 463. She was counseled about the risks of going off all of her medications, but she remained adamant. Id. Ms. Kaufman agreed to help her discontinue her medications safely for her trial, with the understanding that Ms. Jones would assume full responsibility. Id.

On November 6, 2002, Ms. Jones reported that her depression was resolving, and that the day before she had been agitated and irritated, until she took a Zyprexa which resolved the symptoms. Tr. 462. She was moving forward with the vitamin and mineral treatment, called the NewHope plan. Id. Ms. Kaufman wrote,

> She has her hopes fairly high regarding potential outcomes for herself as the program says they have an 85% cure rate with disclaimers for the other percentage around long term discontinuation problems with meds and GI side effects from the vitamin and mineral combinations. We spent quite a bit of time processing

FINDINGS AND RECOMMENDATION Page 19

> this change and potential problems not only with coming off of her meds but potential problems with the supplements. She is willing to take the risk for what she sees as potential benefits and possible cure.

Id. Ms. Kaufman observed that her mood was irritable and agitated. Id. On November 7, 2002, Ms. Jones began the process of decreasing and discontinuing the Ativan over the next 12 days. Tr. 461. On November 12, 2002, the Zyprexa was discontinued. Tr. 460.

On December 16, 2002, Ms. Kaufman recorded that Ms. Jones had begun the decrease in medications as requested by the NewHope program. Tr. 458. She had stopped both Ativan and Zyprexa. Id. She reported dealing with obsessive thoughts about earlier traumas, being unable to sleep. Id. She was aware that she would be losing mental health benefits by February or March. Id. Ms. Kaufman observed that Ms. Jones's mood was irritable and agitated. Id.

From December 2, 2002 to July 8, 2003, Ms. Jones received some individual skill training from Laurel Hill Center. Tr. 484-502. On December 3, 2002, Andrea Mittleider, M.S.W., recorded that Ms. Jones was still trying to manage her symptoms through supplement therapy. Tr. 501. On December 6, 2002, Ms. Mittleider assisted Ms. Jones in completing the paper work for her legal separation from her husband. Tr. 500. Ms. Mittleider wrote, "She is making progress toward getting her paperwork completed but cont[inues] to have difficulty with following through with plans." Id.

On December 10, 2002, Ms. Mittleider assisted Ms. Jones in "separating her meds which have become complicated as she is reducing in 1/4s." Tr. 499. On December 11, 2002, Ms. Mittleider

addressed Ms. Jones's anxiety and talked to her about her medications and their effects on her. Id. On December 13, 2002, Ms. Mittleider discussed Ms. Jones's depression with her and made plans for other services. Id. On December 16, 2002, Ms. Mittleider addressed Ms. Jones's anxiety about losing services from LCMH. Tr. 498. On December 19, 2002, Ms. Jones saw Ms. Mittleider about feeling overwhelmed. Id. Ms. Mittleider wrote, "There have been several med changes this week and it is very difficult for Mollie to set them up. Worked on this together. ... She has made progress toward her goal of being off meds." Id.

On December 23, 2002, Ms. Mittleider and Ms. Jones addressed her increased irritability; they also discussed Ms. Jones's upcoming meeting with the support team and "brainstormed some ideas to make it easier for them and more helpful for Moll[ie]." Tr. 497.

On December 26, 2002, Ms. Mittleider and Ms. Jones discussed her depression. Tr. 496. Ms. Mittleider wrote,

> Mollie reports feeling very down and reports being on the verge of suicidal feelings. Discussed situational influences in addition to the rapid drop in meds this past week. Made a plan together for her safety including adding supports through the weekend, ensuring she gets more rest, securing her remaining meds, and calling TrueHope to see if they would recommend an increase in meds. She did not want to go to the hospital because she believed they would simply put her on her meds again.

Id.

On December 30, 2002, Ms. Mittleider wrote that Ms. Jones was "making progress toward her goal of being more organized and is utilizing list [sic] to help her remember tasks." Tr. 495.

On January 9, 2003, Ms. Mittleider wrote,

> Helped Mollie to plan for her move this weekend. She had

> secured movers, changed utilities, and arranged to have the cash for the move ... She also agreed to let me manage her money beginning 2/1/2003, she has had reluctance to do this even with a plan in mind.

Tr. 493. On January 9, 2003, Ms. Mittleider spoke with Ms. Jones's potential landlord to reassure her about the payment process for Ms. Jones's rent. "Mollie has been late paying rent with her last landlord so it was necessary to have a plan for payment set up ahead of time." Id. On January 13, 2003, Ms. Mittleider assisted Ms. Jones with organizing her move. Tr. 492. On January 15, 2003, Ms. Mittleider obtained a voucher from St. Vincent de Paul to enable Ms. Jones to pay off her electricity bill. Id.

On January 28, 2003, Ms. Mittleider wrote that Cindy Kaufman "has asked that all money be out of Mollie's hands to avoid any problematic spending sprees while she is coming off meds." Tr. 489. Ms. Jones and Ms. Mittleider filled out the paperwork necessary for her to have money management and planned a budget. Id.

On January 29, 2003, Ms. Jones reported to Ms. Kaufman that she was off all of her medications except for a small amount of Effexor, which she was gradually decreasing. Tr. 455. Overall, she felt she was doing well. Id. She began to be manic, but had her NewHope supplements doubled and her symptoms went away. Id. Ms. Kaufman noted that her mood was more peaceful. Id.

On February 6, 2003, Ms. Mittleider wrote that Ms. Jones was "feeling very anxious throughout this week and out of control. She attributes this to mania." Tr. 487. After a discussion, Ms. Jones told her some of the triggers could have been "a talk at church about marriage, changes in OHP coverage, lack of money to pay

FINDINGS AND RECOMMENDATION Page 22

bills, uncertainty of the future." Tr. 487. They planned together for activities that would add some control. Id.

On February 7, 2003, Ms. Jones told Ms. Mittleider that "she would not be able to make good financial decisions on her own," and she agreed to let Ms. Mittleider "help her sort out her budget." Id. They worked on the current month's budget and agreed to have Mollie obtain help from Emmanuel Credit Union with her budget. Id.

On February 10, 2003, Ms. Mittleider helped Ms. Jones address her feelings of being overwhelmed. Tr. 486. They went through a resource list and planned for ways that Ms. Jones could have her needs met through the community. Id. She was referred to Whitebird, Emmanuel Credit, Food for Lane County (a gleaning group), Catholic Community Food Bank, and other organizations. Id. They also talked about medications scholarships that she might need in the future and some support groups for people with bipolar disorder. Id. On February 12, 2003, Ms. Mittleider and Ms. Jones addressed her anxiety about changes. Id. they planned for a budget meeting with Emmanuel the following day. Id.

On February 13, 2003, Ms. Jones was still feeling overwhelmed. Id. Ms. Mittleider accompanied her to Emmanuel Credit, where she was able to go over her budget with a planner and transfer the budgeting service to him. Id. Ms. Mittleider assisted her with planning for budget cuts, communicating with the planner, and providing information to him. Id.

On February 19, 2003, Ms. Jones reported to Ms. Mittleider that she was in a manic phase and unable to follow through with

things. Tr. 485. She appeared calm, which she reported was a "front," and said she was in contact with TrueHope about her symptoms. Id. She and Ms. Mittleider continued planning for her transition out of services, with Ms. Jones requesting Ms. Mittleider's help in finishing her separation case. Ms. Mittleider wrote, "We will do our best to complete it next week." Id.

On February 26 and 28, 2003, Ms. Mittleider worked with Ms. Jones on depression. They discussed the process for finishing up her court documents and plans for transition. Tr. 484. Ms. Mittleider provided a resource list and references for her to use in the future, and signed Ms. Jones up for energy assistance. Id.

On February 26, 2003, Ms. Jones came in for a final appointment with Ms. Kaufman, due to budget cuts at LCMH. Tr. 453, 454. She was given the names of counselors to see if she could afford short-term treatment. Tr. 454. She continued on the supplements, saying her symptoms were as controlled as they had been on medications, but that she had more of "myself back in the picture." Id. Ms. Kaufman wrote,

> Mollie is totally off her meds as requested by NewHope counselors and totally controlled by their supplements. She has family and church support set in place for herself. She will be closed at this point due to program changes.

Id.

On December 5, 2003, Ms. Jones presented at the emergency department of Sacred Heart Medical Center. Tr. 531. She reported that she had been off bipolar medications for a year, having lost her Oregon Health Plan insurance. Id. Her use of nutritional

FINDINGS AND RECOMMENDATION Page 24

supplements in lieu of medication had not worked, and she stated she was having increasing problems with depression since September 2003. Id. She was observed to have a somewhat flat affect and a depressed mood, but was not exhibiting hallucinations or delusions. Tr. 532. Ms. Jones was referred to Nonie Ganaki MSW at the mental health department of the hospital. Id.

Ms. Ganaki recorded that Ms. Jones said she was having suicidal thoughts, with a plan to overdose on lorazepam. Tr. 530. She had been a patient at LCMH until she was terminated after cuts to the Oregon Health Plan, then was unable to see a private counselor or fill her medications. Id. Ms. Jones's son was present for half of the interview, stating that his mother had been under an increased amount of stress, having recently changed churches and had a falling out with friends. Id. Her son was living with her and paying some of her bills. Id. Ms. Ganaki observed that Ms. Jones's affect was labile and her moods swung from sad to irritated. Id. Motor activity was restless. Id. She was oriented x 3 and her thoughts were tangential and logical. Id. She was given a two-week supply of Paxil, a referral to Volunteers in Medicine for medication prescriptions and enrollment in the patient assistance program, and to the Center for Family Therapy for sliding fee scale counseling at the University of Oregon. Id.

### Hearing Testimony

Ms. Jones testified at the hearing that she is currently receiving services from Laurel Hill Center, where she is receiving employment counseling and assistance with personal skills. Tr. 550-

51. She was not currently on medication, relying on nutritional supplements from TrueHope. Tr. 562. Ms. Jones stated that she sometimes goes to sleep any time between 11:00 p.m. and 3:00 a.m., and gets up at 7:00 a.m. Tr. 563. She cooks dinner for herself and her son three or four times a week. Id. She does minimal housework: cleaning the bathroom and kitchen, washing dishes, making her bed and doing her laundry. Id. She watches television about three hours a day unless she has a meeting at her church. Id. She goes to church meetings three times a week for Bible study, an hour and a half to three hours at a time. Tr. 565. She has attended these meetings since 1986. Tr. 566. Two or three times a week, for an hour and a half to two hours at a time, she goes door to door to discuss her religion. Tr. 567. She has engaged in this activity for the past three years, although she took a break of six or nine months from July 2002 to January 2003, while she and her husband were separating. Tr. 568. Ms. Jones obtained her separation with the help of attorneys from Legal Aid, who gave her the paperwork and helped her to fill it out. Tr. 569. Ms. Jones said her inability to work for sustained periods was caused by feeling overwhelmed, feeling "like I can't sit still or maybe there are pressures at home that are overwhelming to me." Tr. 571. She explained that she was able to go to church meetings on a regular basis because "I'm surrounded by people who love me and support me and help me. The information that I see at the meetings is up-building and encouraging and helps to direct my life in a positive way." Tr. 571-72. Ms. Jones added, "[T]here are certainly plenty of

times when I flee the meetings, when I leave, or have to go-you know-I'm up out of my seat. I'm back in the bathroom. I'm-go outside for a while. Whatever it takes." Tr. 572. She testified that she did not find going door to door for her church stressful because "it gets me out of the house and focusing not on myself or my own problems but on other people, and I'm with friends... I don't have to achieve anything when I go out... when I'm out in the preaching work, there is no expectation. ... I can go home any time I want, when I ... get upset, people take me home or I sit in the car." Tr. 574. The ALJ asked whether she found confrontation stressful, and she responded, "I don't engage in confrontation. If someone tells me that they're not interested, I wish them a happy day, and I go on my way." Tr. 575. She said she does her preaching with the expectation that 95% of the people "are not going to be interested in what I say ... but it's not me personally." Tr. 576. Upon further questioning by the ALJ, Ms. Jones said,

> There is something in me that causes me to be anxious, and the majority of the time, I cannot even identify what I am anxious over. I just become fearful or like I say not able to hold still, a feeling that life is not worth living... it's not something external. The things that you're speaking about in the preaching work, those are external things. I don't get upset with people getting critical of me or cussing at me or whatever. That doesn't bother me, no. And it wouldn't bother me on a job.

Tr. 577. She explained that in a typical month of going door to door, she would ask to be taken home once or twice, but that she also took breaks to "collect myself or to pray or to get whatever reassurance I need from the people I'm with in between." Tr. 578.

The ALJ inquired of Ms. Jones about her two-month trip to

Nicaragua. She said she went there because she was "looking for a different place to live, where I felt I might have a more rewarding life, where I was needed maybe in the preaching world, but — and where the pressures weren't so great as I feel they are here." Tr. 579. She said she stayed with other Jehovah's Witnesses, and went to three or four different locations to "find out what type of a place I might want to locate in." Tr. 579. Ms. Jones said she experienced the same problems in Nicaragua that she always had, including anxiety and mood swings. Tr. 580.

Ms. Jones testified that sometimes she would quit jobs "in a kind of a rash hot-headed kind of experience," tr. 581 and sometimes, during a depressed phase, she would "feel like isolating myself, and I have to make myself go to meetings and in the preaching work." She said during those times she didn't "engage in activities other than maybe sitting in front of the TV or the computer playing solitaire, anything that causes me not to have to think." Tr. 581. Ms. Jones said, "When I'm depressed, I force myself to do things, and when I'm manic, I will isolate myself because I do really stupid things." Tr. 582.

At the supplemental hearing, the ALJ heard testimony from a vocational expert (VE), Mark McGowan. The ALJ asked the VE to consider an individual without exertional limitations, and with the abilities found by Dorothy Anderson, the agency's reviewing psychologist, which were:

> Claimant is capable of understanding and remembering simple instructions and procedures; claimant is able to sustain attention and concentration to complete two to three-step tasks; is able to maintain a schedule; should

> not be required to have direct public contact but can
> have occasional incidental contact; is able to respond to
> workplace setting, routine; can drive; some difficulty
> setting goals and making plans.

Tr. 326. The VE testified that such an individual could return to her past relevant work as a commercial cleaner and seat manufacturer, and that she could perform other work in the national economy, including marker, kitchen helper, and cleaner. Tr. 609-10. The ALJ then asked the VE to consider an individual with the limitations set out by Dr. Bonner, and the VE testified that such an individual could not perform her past relevant work or any other work in the national economy. Tr. 610-11.

## ALJ's Decision

The ALJ found that Ms. Jones had the severe impairment of bipolar disorder, but that it did not meet or equal any Listing in the Listing of Impairments, 20 C.F.R., Part 404, Subpart P, Appendix 1. Tr. 16. He found that she had the residual functional capacity to return to her past relevant work as a commercial cleaner, marker, kitchen helper or housekeeper. Tr. 20.

The ALJ disbelieved Ms. Jones's claims of mood instability because on January 31, 2002, Ms. Kaufman had recorded that Ms. Jones was generally on time for appointments, that her grooming and hygiene were excellent, that she was a warm, engaging person, affect was full range and appropriate, speech was fast paced but not pressured, thoughts were logical and coherent, and that she had "always appeared to have euthymic mood to this clinician." Tr. 16-17.

FINDINGS AND RECOMMENDATION Page 29

The ALJ rejected the December 20, 2001 letter from Mari Jones and Cindy Kaufman stating that Ms. Jones did not do well under stress and decompensated mentally when in sustained stressful situations, because their report did not take into account the claimant's history of "handling stressful situations adequately, including her travels through Nicaragua, her door-to-door religious work, and her Bible study." The ALJ found further that the LCMH chart notes showed that Ms. Jones was "generally coping well with stressful situations including a trip to Central America and difficulties in her relationship with her husband." Tr. 17.

The ALJ noted Dr. Kurlychek's May 2002 evaluation of Ms. Jones, and his diagnoses of cognitive disorder, major depressive disorder, and borderline personality features, and his opinion that Ms. Jones had difficulties due to psychological and emotional factors, but also noted that "Dr. Kurlychek did not indicate that the claimant was unable to work." Tr. 18.

The ALJ noted Dr. Kurlychek's August 2002 findings, but found that they were "belied by the claimant's effective functioning in a significantly changed environment (Nicaragua) and in day to day personal and church-related functioning." Id.

The ALJ rejected Dr. Bonner's August 2002 findings because they were "inconsistent with the claimant's demonstrate[d] functional ability and are inconsistent with the ratings of Dr. Kurlychek." Id. He rejected Dr. Bonner's opinion that Ms. Jones would decompensate because "it is inconsistent with the record as a whole, including the claimant's successful international travel

FINDINGS AND RECOMMENDATION Page 30

and church-related activities." Id. The ALJ rejected Dr. Bonner's marked limitation ratings for the same reasons. Id.

The ALJ did not believe Ms. Jones had incapacitating mental symptoms because she had chosen not to take medication. Tr. 19. He disbelieved her allegations of memory problems because

> she remembers what is advantageous to her claim but allegedly has difficulty recalling information or events that may not support her claim of disability. For example, the claimant recalls how much she had to lift in a particular job, but not how long she worked in the job or any dates dealing with the job.

Tr. 19. The ALJ did not believe Ms. Jones's statement that she could not handle stress and had difficulty with concentration because her

> significant activities are in contradiction to these allegations. For example in 2000, the claimant went to Nicaragua. ... The claimant acknowledged under questioning that she found herself in a wide spectrum of circumstance in Nicaragua, including stays at houses with no windows, with outhouses, or primitive toilet and showering facilities, as well as periods of time in the city. ... Yet, none of this caused the claimant to experience emotional distress.

Id. The ALJ noted Ms. Jones's testimony that she did door to door solicitation with the Jehovah's Witnesses two to three times a week for an hour and a half to two hours, and that despite rejections, she was able to engage in this activity without stress, even though she had to go home early several times a month. Tr. 19. The ALJ also noted that Ms Jones drives to her meeting hall three times a week, without stress, and that she had prepared the paperwork for her separation from her husband and negotiated child and spousal support payments from him. Id.

FINDINGS AND RECOMMENDATION Page 31

The ALJ disbelieved Ms. Jones's allegations of difficulty in concentration and attention because she was able to watch television about three hours a day; had no apparent difficulties using the Internet 30 minutes at a time; was able to cook meals for herself and her son, clean the bathroom and kitchen, make beds, and do laundry; and attend Bible studies three times a week for two and a half to three hours at a time. Id.

The ALJ acknowledged John Jones's third-party report of Ms. Jones's activities of daily living, but found, "To the extent that the son and the claimant describe greater limitations, they are not found to be credible for the reasons set forth above." Tr. 20.

## Standards

The court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record. Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir. 1999). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). In determining whether the Commissioner's findings are supported by substantial evidence, the court must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998). However, the Commissioner's decision must be upheld even if "the evidence is susceptible to more than one rational interpretation." Andrews, 53

FINDINGS AND RECOMMENDATION Page 32

F.3d at 1039-40.

The initial burden of proving disability rests on the claimant. Meanel, 172 F.3d at 1113; Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995). To meet this burden, the claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).

A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). This means an impairment must be medically determinable before it is considered disabling.

The Commissioner has established a five-step sequential process for determining whether a person is disabled. Bowen v. Yuckert, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520, 416.920. In step one, the Commissioner determines whether the claimant has engaged in any substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, the Commissioner goes to step two, to determine whether the claimant has a "medically severe impairment or combination of impairments." Yuckert, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c). That determination is governed by the "severity regulation," which provides:

> If you do not have any impairment or combination of impairments which significantly limits your physical or

FINDINGS AND RECOMMENDATION Page 33

> mental ability to do basic work activities, we will find
> that you do not have a severe impairment and are,
> therefore, not disabled. We will not consider your age,
> education, and work experience.

§§ 404.1520(c), 416.920(c). If the claimant does not have a severe impairment or combination of impairments, the disability claim is denied. If the impairment is severe, the evaluation proceeds to the third step. <u>Yuckert</u>, 482 U.S. at 141.

In step three, the Commissioner determines whether the impairment meets or equals "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." <u>Yuckert</u>, 482 U.S. at 140-41. If a claimant's impairment meets or equals one of the listed impairments, he is considered disabled without consideration of her age, education or work experience. 20 C.F.R. s 404.1520(d), 416.920(d).

If the impairment is considered severe, but does not meet or equal a listed impairment, the Commissioner considers, at step four, whether the claimant can still perform "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant can do so, he is not considered disabled. <u>Yuckert</u>, 482 U.S. at 141-42. If the claimant shows an inability to perform his past work, the burden shifts to the Commissioner to show, in step five, that the claimant has the residual functional capacity to do other work in consideration of the claimant's age, education and past work experience. <u>Yuckert</u>, 482 U.S. at 141-42; 20 C.F.R. §§ 404.1520(f), 416.920(f).

///

FINDINGS AND RECOMMENDATION Page 34

## Discussion

Ms. Jones asserts that the ALJ erred in 1) finding that her bipolar disorder did not meet or equal any of the Listings in the Listing of Impairments, because Dr. Kurlychek and Dr. Bonner both found that she did, and the ALJ did not give clear and convincing reasons for rejecting their opinions; 2) rejecting the observations and opinions of nurse practitioner Kaufman and therapist Mari Jones; 3) improperly rejecting Ms. Jones's testimony; 4) improperly rejecting the statements of Ms. Jones's son; and 5) omitting a number of relevant limitations from his step three, four and five conclusions. She asks that the improperly rejected evidence be credited as a matter of law, and that this case be reversed and remanded for the payment of benefits.

1.    Evidence that Ms. Jones meets a Listing

If a claimant meets the criteria for a medical listing, or if her condition is medically equivalent to listing, then he or she is presumptively disabled without consideration of age, education and work experience. <u>Pitzer v. Sullivan</u>, 908 F.2d 502 (9th Cir. 1990). Dr. Kurlychek and Dr. Bonner made findings that satisfied the criteria for Listing 12.04, Affective Disorders.

The level of severity required to satisfy Listing 12.04 is met when the requirements of both A and B are satisfied, or, alternatively, when the requirements of A and C are satisfied. For purposes of this case, the relevant requirement of part A is "Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes

(and currently characterized by either or both syndromes).

The ALJ found that Ms. Jones had bipolar disorder. The medical evidence, covering a period of approximately six years, establishes diagnoses of bipolar disorder with both manic and depressive syndromes, with depressive syndrome predominating. See, e.g., tr. 209 (Janet Vondran, M.D.)(diagnosis of bipolar disorder, mixed state), tr. 251 (Lisa Sjodin, M.D.)(diagnosis of bipolar affective disorder type I, most recent episode depressed), tr. 257 (Frank Lahman, Ph.D)(explicit finding of part A), tr. 313 (Dorothy Anderson, Ph.D)(finding of bipolar affective disorder, type I).

Part B is satisfied on a showing that the bipolar syndrome results in at least two of the following: 1) marked restriction of activities of daily living; 2) marked difficulties in maintaining social functioning; 3) marked difficulties in maintaining concentration persistence, or pace; or 4) repeated episodes of decompensation, each of extended duration. Dr. Bonner found that Ms. Jones had marked limitations of concentration, persistence, and pace, and marked limitations in her activities of daily living, tr. 441, thereby meeting the criteria for part B.

Part C is satisfied with a showing of a medically documented history of a chronic affective disorder of at least two years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: 1) repeated episodes of decompensation, each of extended duration; or 2) a residual disease process that has resulted in

such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate. Dr. Kurlychek found only moderate limitations of concentration, persistence or pace, but made explicit findings satisfying the criteria of part C. Tr. 437.

In summary, both Dr. Kurlychek and Dr. Bonner made findings sufficient to satisfy the criteria for Listing 12.05. Dr. Kurlychek is an examining psychologist and Dr. Bonner is a treating physician. See <u>Benton ex rel. Benton v. Barnhart</u>, 331 F.3d 1030 (9th Cir. 2003) (supervising psychiatrist considered a treating source where the psychiatrist oversees a team of therapists, even though the psychiatrist saw the claimant once; other members of the treatment team had sufficient contact with the claimant, the psychiatrist completed his assessment of the claimant's mental residual functional capacity based on information provided by those on the team with more direct contact, and the psychiatrist continued to manage the claimant's medications).

Title II's implementing regulations distinguish among the opinions of three types of physicians: 1) those who treat the claimant; 2) those who examine but do not treat; and 3) those who neither examine nor treat. <u>Holohan v. Massanari</u>, 246 F.3d 1195, 1201 (9th Cir. 2001); <u>Lester v. Chater</u>, 81 F.3d 821, 830 (9th Cir. 1995); 20 C.F.R. § 404.1527(d). Generally, a treating physician's opinion carries more weight than an examining physician's and an examining physician's opinion carries more weight than a reviewing physician's. <u>Holohan</u>, 246 F.3d at 1202; <u>Lester</u>, 81 F.3d at 830; 20

FINDINGS AND RECOMMENDATION Page 37

C.F.R. § 404.1527(d). In addition, the regulations give more weight to opinions that are explained than to those that are not, <u>Holohan</u>, 246 F.3d at 1202, see also 20 C.F.R. § 404.1527(d), and to the opinions of specialists concerning matters relating to their specialty over that of nonspecialists, see <u>id</u>. and § 404.1527(d)(5).

The opinions of Doctors Kurlychek and Bonner are contradicted by those of Social Security reviewing psychologists Lahman and Anderson,[1] and the ALJ relied on the opinions of the latter for his findings. The ALJ is entitled to rely on opinions of reviewing physicians which contradict those of treating and examining physicians, but only if he provides "specific and legitimate reasons," supported by substantial evidence in the record, for rejecting the opinions of the treating and examining physicians. <u>Reddick</u>, 81 F.3d at 725. This can be done by setting out a detailed and thorough summary of the facts and conflicting medical evidence, stating his interpretation of them, and making findings. <u>Id.</u> The ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they are correct. <u>Id.</u>

---

[1] The ALJ also referred to Dr. Kincade's "brief mental status examination," after which Dr. Kincade opined that Ms. Jones's short-term memory appeared to be adequate because she "can remember presidents." Tr. 16. However, as the ALJ acknowledged, Dr. Kincade referred Ms. Jones to Dr. Jensen for evaluation of her loss of memory symptoms.

a. Dr. Kurlychek

The ALJ's stated reason for rejecting Dr. Kurlychek's part C findings was that they were "belied by the claimant's effective functioning in a significantly changed environment (Nicaragua) and in day to day personal and church-related functioning." This finding does not meet the "specific and legitimate reasons" standard. First, Ms. Jones went to Nicaragua a year before Dr. Kurlychek made his findings; her ability to function a year before Dr. Kurlychek's findings is not sufficient with a condition that varies in the way manic depression does. Second, there is no evidence in the record that Ms. Jones functioned "effectively" in Nicaragua beyond her own bare statement to Ms. Kaufman that "things had been good for her there." Tr. 352. There is no evidence that Ms. Jones was employed in Nicaragua; in fact, she testified at the hearing that while there, she was merely "seeing the way that the people lived." Tr. 580. Ms. Jones testified at the hearing that she experienced the same problems in Nicaragua that she had elsewhere, including anxiety and mood swings. Id.

I note further that Ms. Jones's statement to Ms. Kaufman that "things had been good for her" in Nicaragua was accompanied with the report that she had what appeared to be dissociative episodes in Nicaragua. The evidence does not support the ALJ's finding that Ms. Jones functioned "effectively" in Nicaragua.

The record as a whole does not contain substantial evidence which supports the ALJ's finding that Ms. Jones functioned effectively on a day-to-day basis. The evidence from Ms. Mittleider

indicates that after the separation from her husband, Ms. Jones needed, and received, ongoing assistance from her in such areas as basic money management, managing her medications, making lists for remembering tasks, negotiating with the landlord, making rent payments, organizing a move to a different residence, getting utility vouchers and other public services, and finding a therapist.

Ms. Jones's therapy records show, besides two hospitalizations for suicidal depression, nearly continuous reports to therapists of depression. See, e.g., tr. 395 (wanting to die), tr. 418, tr. 276 (depression with suicidal feelings), tr. 351 ("very depressed and distressed,"), tr. 368 (in depressive swing), tr. 364 (feeling like killing herself or someone else). They also show reports of severe anxiety, tr. 386 (consumed with worry), tr. 359 (anxious, nauseated, tremorous); panic attacks, tr. 418; compulsive eating, tr. 418, tr. 347 (weight gain of 30 pounds in four months); sleeplessness and lack of energy (tr. 382); manic episodes of overspending, tr. 362 (running up credit cards), tr. 354 (spending $400 on groceries), tr. 370 ("feels tired from constantly being guard against doing 'something bad'"); irritability, tr. 370 (near loss of job because of irritability), tr. 573 (fired from job at Sears for insubordination), tr. 349 (son accompanies her to session, feels she has been "losing it lately in that she is stressed and irritated about everything"), tr. 349 ("lashing out at the boys"); and episodes of dissociation, tr. 385-86, 352, 350, 400.

Ms. Jones's counseling records also indicate severe personal problems, including money worries, difficulties with the children, and marital problems culminating in separation, which contradict the ALJ's finding of effective day to day functioning. See, e.g., tr. 353 (family's monthly expenses outweigh monthly income by $1200); tr. 394-95 (worries about oldest son whom she believes to be bipolar, feeling "in the middle" between husband and children), tr. 386 (concerned about son who is "grossly obese," will not diet, and is currently "manic" but refusing help; worried about the fact that she has little impact on his behavior), tr. 378 (children required to take a lot of responsibility for helping her to remember things and taking her places), tr. 370 ("she knows she's out of line when her son stands in front of her waving his hands about something she is saying or doing in public"), tr. 348 (neither son has job); tr. 356 (very distressed about husband viewing pornography on Internet; reports previous episodes of marital rape during her recovery from cervical surgery and subsequent "life threatening" infection), tr. 395 ("relationship where there is little to no love"), tr. 392 (seriously considering separation from husband, meeting with church elders to discuss separation), tr. 355 (church elders meeting with husband about pornography), tr. 353 (husband in therapy for sexual problems), tr. 387 (husband in California, tells her he is not returning), tr. 345 (therapist's note that "her capacity to deal/not deal with her daily life when she is alone is terrifying to her").

Although Ms. Jones reported that she "thrives on" church work,

tr. 368, the record shows that church work was also sometimes problematic for her. See, e.g., tr. 413 (needing to cut back or eliminate ministry schedule due to depressive or manic symptoms), tr. 572 (testimony that she took a break of six to nine months from preaching during separation from her husband), tr. 568 (need on occasion to flee from church meetings), tr. 391 (feeling "irritation" with church elders for being supportive of her husband), tr. 530 (recent change of churches and falling out with friends).

### b. Dr. Bonner

The ALJ rejected Dr. Bonner's findings because they were "inconsistent with" Ms. Jones's "demonstrated functional ability" and inconsistent with "the ratings of Dr. Kurlychek." He also found that Dr. Bonner's finding about decompensation was "inconsistent with the record as a whole, including the claimant's successful international travel and church-related activities."

The ALJ did not point to any evidence in the record to indicate what Ms. Jones's "demonstrated functional ability" was, or how Dr. Bonner's findings were inconsistent. Mere conclusions do not suffice as specific and legitimate reasons. Reddick, 157 F.3d at 725.

The ALJ's rejection of Dr. Bonner's findings because they were inconsistent with the ratings of Dr. Kurlychek is curious, because the ALJ also rejected the ratings of Dr. Kurlychek.

The ALJ's rejection of Dr. Bonner's findings because they were "inconsistent with the record as a whole" is legally inadequate.

FINDINGS AND RECOMMENDATION Page 42

See Reddick, 157 F.3d at 722 (general findings are insufficient). The ALJ's reliance on Ms. Jones's "successful international travel" and to success in her church-related activities are, as discussed above, unsupported by the record as a whole.

I conclude that the ALJ's reasons for rejecting the opinions of Doctors Bonner and Kurlychek are not based on substantial evidence in the record. Further, the ALJ's findings fail to meet the "specific and legitimate reasons" standard because he has failed to make any findings with respect to the conflicting medical evidence, his interpretation of that evidence, or his reasons for accepting the evidence of the reviewing psychologists over the findings of Doctors Kurlychek and Bonner.

2.   Observations of nurse practitioner Kaufman and therapist Jones

The ALJ rejected the opinions of Mari Jones and Cindy Kaufman that Ms. Jones did not do well under stress and decompensated when in sustained stressful situations because their report did not take into account Ms. Jones's history of "handling stressful situations adequately," including traveling to Nicaragua, door-to-door religious work, and Bible study. However, these findings are not based on substantial evidence in the record. For the reasons already discussed, and discussed below, there is no evidence that Ms. Jones's travel to Nicaragua constituted a stressful situation. The evidence shows that although Ms. Jones is able to do the door-to-door religious work, she was unable to do it for six months or more during her separation from her husband, and that she fairly often decides not to do it or leaves early because it becomes too

stressful for her. The ALJ's finding that Ms. Jones is able to handle the stressful situation of Bible study is unsubstantiated by the record, since there is no indication in the evidence that Bible study is a stressful situation.

The ALJ made no findings about the recorded observations by Ms. Kaufman of Ms. Jones's affect and mood. See, e.g., tr. 359 (Ms. Jones's affect was depressed and her mood "down, discouraged"), tr. 358 (speech was "tangential and hyperverbal"), tr. 465 (affect was "sad, constricted," and that she had "difficulty presenting thoughts coherently" and tears), tr. 462, 458 (mood was irritable and agitated), tr. 363 ("affect is depressed as is mood," "psychomotor movements decreased and posture slumped").

Under Social Security regulations, Ms. Kaufman is an acceptable medical source, since the record indicates that she works under the supervision of Dr. Bonner. See Gomez v. Chater, 74 F.3d 967 (9th Cir. 1996)(nurse practitioner supervised by psychiatrist can constitute an acceptable medical source). However, even if Ms. Kaufman is deemed nothing more than a lay witness, lay testimony as to a claimant's symptoms is competent evidence which the ALJ must take into account, Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir. 1993), unless he expressly determines to disregard such testimony, in which case "he must give reasons that are germane to each witness." Id.

Ms. Kaufman is a trained psychological observer who recorded Ms. Jones's symptoms on at least a semi-monthly basis over a period of four years. The ALJ gave no reasons at all for disregarding her

FINDINGS AND RECOMMENDATION Page 44

observations, even though they directly contradict his findings that, during the same period of time Ms. Jones was seeing Ms. Kaufman, she functioned "effectively" on a day-to-day basis, and was able to cope adequately with stressful situations. The ALJ erred in this respect.

3.    Testimony of Ms. Jones

The ALJ's credibility findings must be supported by specific, cogent reasons. Reddick, 157 F.3d at 722. Unless there is affirmative evidence showing that the claimant is malingering, the Commissioner's reasons for rejecting the claimant's testimony must be "clear and convincing." Id. The ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints. Id. The evidence upon which the ALJ relies must be substantial. Id. at 724. See also Holohan v. Massinari, 246 F.3d 1195, 1208 (9th Cir. 2001)(same).

There is no evidence in this record that Ms. Jones is malingering. Therefore, the ALJ's credibility findings must be supported by clear and convincing reasons, based upon substantial evidence in the record.

The ALJ's adverse credibility finding with respect to Ms. Jones's inability to handle stress was largely based on her trip to Nicaragua in 2001 and her ability to do door to door solicitation with the Jehovah's witnesses. But as discussed above, there is no evidence that the trip to Nicaragua was stressful for Ms. Jones. The ALJ assumed that staying at homes with outhouses or primitive showering facilities would cause Ms. Jones emotional distress, but

FINDINGS AND RECOMMENDATION Page 45

the evidence does not support this assumption. Ms. Jones denied that she found the absence of running water or indoor toilets stressful, because "I've had to live like that, so to me it was familiar." Tr. 585. Ms. Jones also testified, "That kind of thing doesn't bother me." Tr. 586. There is no evidence that Ms. Jones was employed in Nicaragua or otherwise engaged in any activity characterized by stress or demands upon her ability to concentrate or remember. It is clear from Ms. Jones's testimony that her time in Nicaragua was spent in the company of other church members.

Ms. Jones testified that going door to door with the Jehovah's witnesses was not stressful for her and did not trigger her psychiatric symptoms because her symptoms were caused by internal stressors rather than external ones, there were no expectations attached to door to door proselytizing and she was not under pressure to perform, she could leave whenever it became too much for her, she was able to take breaks to collect herself, and she was accompanied by friends. There is no indication that the ALJ considered this testimony in making his findings. In this jurisdiction, a Social Security claimant's ability to perform volunteer work, where the claimant is free to leave at any time, does not demonstrate the ability to function in a work environment, and is not necessarily inconsistent with disability. See McAllister v. Sullivan, 888 F.2d 599, 602-03 (9th Cir. 1989).

The ALJ disbelieved Ms. Jones's claims of inability to handle stress because of her testimony that she prepared the paperwork for her separation from her husband. However, this finding is not

factually accurate. Ms. Jones testified that she received assistance with the paperwork from a Legal Aid attorney, and the evidence from Ms. Mittleider shows that Ms. Jones received additional assistance with her separation paper work from her on December 6, 2002, and on February 26 and February 28, 2003.

The ALJ disbelieved Ms. Jones's claims of mood instability on the basis of a single observation by Ms. Kaufman on January 31, 2002, that Ms. Jones was generally on time for appointments, had excellent grooming hygiene, was warm and engaging, and that her affect was full range and appropriate, speech unpressured, thoughts logical and coherent, and mood appeared euthymic.

Treatment notes are to be read in full and in the context of the overall diagnostic picture. Holohan, 246 F.3d at 1205. A single notation indicating improvement in symptoms is not conclusive on the issue of whether a claimant's impairments seriously affect her ability to function. Id. This is particularly true with a condition such as manic depression, with its polar swings.

The many occasions on which Ms. Kaufman observed Ms. Jones's affect, speech, and mood to be significantly different from those recorded in this single entry are discussed above and will not be repeated. I conclude that this finding does not constitute a clear and convincing reason, based on substantial evidence in the record, for disbelieving Ms. Jones's testimony.

The ALJ disbelieved Ms. Jones's claim of incapacitating mental symptoms because she chose not to take medication. The ALJ may consider an unexplained absence of treatment when considering the

FINDINGS AND RECOMMENDATION Page 47

credibility of a claimant's complaints. <u>Orteza v. Shalala</u>, 50 F.3d 748 (9th Cir. 1995). However, in this case, the record as a whole reflects that Ms. Jones took a large number of medications-- including Lithium, Depakote, Effexor, lorazepam, Neurontin, clonazepam, Tegretol, and Risperdol-- over a prolonged period of time before attempting a treatment regimen of nutritional supplements. The record also reflects that Ms. Jones's transition to nutritional supplements in lieu of medication was gradual, carefully monitored by Ms. Kaufman and others at LCMH and, to some extent at least, supported by Ms. Jones's therapists at LCMH. The record as a whole does not suggest that Ms. Jones's attempt, after several years on medication, to control her symptoms with nutritional supplements rather than psychotropic drugs reflects adversely on the credibility of her reported symptoms.

The ALJ disbelieved Ms. Jones's testimony of difficulty in concentration and attention because she was able to watch television for three hours, use the computer for 30 minutes at a time, cook meals, do some housework and laundry, and attend Bible study. None of these reasons is clear and convincing or based on substantial evidence in the record.

Ms. Jones testified at the hearing that she watches television programs such as "ER," "Law and Order," and "occasionally a movie," tr. 564, and plays solitaire on the computer because these activities cause her "not to have to think." There is no indication in the record that either of these activities requires high levels of concentration or close attention.

The ability to cook two or three dinners a week, clean a kitchen and bathroom, and do her own laundry similarly does not constitute a clear and convincing reason for rejecting Ms. Jones's reported inability to concentrate. Activities that include taking care of oneself, hobbies, therapy and household tasks are not considered substantial gainful activity disqualifying one from receiving disability benefits, <u>Corrao v. Shalala</u>, 20 F.3d 943 (9th Cir. 1994), in the absence of evidence that the ability to perform these activities is transferable to a work setting. <u>Smolen v. Chater</u>, 80 F.3d 1273 (9th Cir. 1996). More particularly, they suggest little, if anything, about an individual's ability to concentrate.

The ALJ failed to articulate any reason for disregarding Dr. Kurlychek's findings, based on diagnostic tests for which Ms. Jones "appeared to put forth her best efforts," that Ms. Jones had a cognitive disorder.

The ALJ's disbelief of Ms. Jones's claimed memory and cognitive difficulties also fails to take into account Ms. Jones's consistent complaints to therapists of cognitive and memory problems which she attributed to Depakote and other medications, and which Dr. Jensen, the neurologist, also thought might be a side effect of her medications. Because the side effects of medication can affect an individual's ability to work, they must be considered in disability determinations. <u>Varney v. Secretary of Health & Human Services</u>, 846 F.2d 581, 585 (9th Cir. 1988). "Side effects can be a 'highly idiosyncratic phenomenon' and a claimant's testimony as

to their limiting effects should not be trivialized." Id.

I conclude that the ALJ's credibility findings are not supported by clear and convincing reasons based on substantial evidence in the record.

4.    Testimony of John Jones

The ALJ rejected the third-party questionnaire completed by John Jones in November 2001 for "the reasons set forth above," i.e., the same reasons he articulated for rejecting the evidence from Mari Jones, Cindy Kaufman, Dr. Kurlychek, Dr. Bonner, and Ms. Jones. These reasons are unsupported by substantial evidence in the record as a whole, as discussed above, and are therefore inadequate to support the ALJ's conclusion.

5.    Remand

The decision whether to remand for further proceedings or for the payment of benefits turns upon the likely utility of  further proceedings. Harman v. Apfel, 211 F.3d 1172, 1179 (9th Cir. 2000). A remand for further proceedings is unnecessary if the record is fully developed and it is clear from the record that the ALJ would be required to award benefits. Holohan, 246 F.3d at 1210. In cases in which it is evident from the record that benefits should be awarded, remanding for further proceedings would needlessly delay effectuating the primary purpose of the Social Security Act-i.e., to give financial assistance to disabled persons because they cannot sustain themselves. Id.

In Smolen v. Chater, 80 F.3d 1273, 1292 (9th Cir. 1996), the court held that improperly rejected evidence should be credited and

FINDINGS AND RECOMMENDATION Page 50

an immediate award of benefits be made when: 1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, 2) there are no outstanding issues that must be resolved before a determination of disability can be made, and 3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

I conclude that the Smolen standard is met here. The findings of Doctors Bonner and Kurlychek satisfy the A, B, and C criteria for Listing 12.05; the findings of either of them therefore establishes Ms. Jones's disability as a matter of law. The ALJ failed to provide legally sufficient reasons for rejecting their evidence. It should therefore be credited as true. See Benecke v. Barnhart, 379 F.3d 587, 594 (9th Cir. 2004). The evidence of Doctors Bonner and Kurlychek, along with the treatment records from LCMH and the improperly rejected testimony of Ms. Jones and her son John Jones, leave no outstanding issues to be resolved before a determination of disability can be made. It is clear from the record that the ALJ would be required to find Ms. Jones disabled if all of the improperly rejected evidence were credited. I recommend that this case be reversed and remanded for the payment of benefits.

**Scheduling Order**

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due June 3, 2005. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.

FINDINGS AND RECOMMENDATION Page 51

If objections are filed, a response to the objections is due June

/// 

/// 

17, 2005, and the review of the Findings and Recommendation will go

under advisement on that date.

Dated this <u>19th</u> day of <u>May</u>, 2005.

/s/   Dennis James Hubel

Dennis James Hubel
United States Magistrate Judge

FINDINGS AND RECOMMENDATION Page 52